U.S. District Court
District of Connecticut
FILED AT NEW HAVEN

October 6                23
By   S. Santos
        Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF CELLULAR DEVICES | Case No.  3:23-mj-00895 (MEG) <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Daniel Veale, being duly sworn, deposes and says:

## INTRODUCTION

1.       I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.       I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI since June 2014. I have been assigned to the FBI's New Haven, Connecticut Field Office, and, more specifically, to the Waterbury Safe Streets Gang Task Force ("Task Force"). The Task Force includes special agents of the FBI, and law enforcement officers with the the Waterbury Department (WPD), the Naugatuck Police Department (NPD), Wolcott Police Department, and the Connecticut Department of Correction (DOC). As a Task Force member, I direct the instant investigation of a drug trafficking organization (DTO) in Waterbury, Connecticut, involving Tommy FIGUEROA, Jose DELROSARIO-CANELA, and others. I have participated fully in this investigation and have also received information from other law enforcement officers. I am thoroughly familiar with the investigation and the information set forth in this affidavit based on my training and experience, written investigative reports, physical surveillance, records pertaining to cellular telephones, motor vehicles, and other information, as

well as lawfully recorded and intercepted communications, statements from cooperating sources, and other information I have reviewed and determined to be accurate and reliable. Because the information and evidence gathered during this investigation is voluminous, I have not included each fact known to me concerning this investigation. Instead, I have set forth those facts that I believe are necessary to establish the existence of probable cause to support the requested authorizations.

3.     I am one of the case agents directing the investigation of members and associates of a drug trafficking organization ("DTO") of which Tommy FIGUEROA and Jose DELROSARIO-CANELA are a part of, for violations of 21 U.S.C. § 841(a)(1) (possession with the intent to distribute and distribution of controlled substances); 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute and distribution of controlled substances); 21 U.S.C. § 843(b) (use of a communication facility in furtherance of a controlled substance felony); and 18 U.S.C. § 924(c) (using and carrying a firearm during and in relation to, and possession of a firearm in furtherance of, a drug trafficking offense) (the "Subject Offenses").

4.     I have participated fully in this investigation and, because of this participation and information received from other law enforcement officers, I am thoroughly familiar with the circumstances of the investigation and the information set forth in this affidavit.

5.     This affidavit is submitted in support of warrants to search the following cellular telephones, and to extract electronically stored information:

   a.   **Subject Phone 1,** a black Samsung cellular telephone in a black case, IMEI: 353122990222239, which was seized during the arrest of FIGUEROA on September 25, 2023, and which is presently in the custody of the FBI, as further described in Attachment A-1.

   b.   **Subject Phone 2,** a blue Motorola cellular telephone in a black case, which was seized during the arrest of DELROSARIO-CANELA on September 25, 2023, and which is presently in the custody of the FBI, as further described in Attachment A-2.

6.     The proposed warrants would authorize the forensic examination of the **Subject Phone 1** and **Subject Phone 2** (collectively, the "**Subject Phones**") for the purposes of identifying electronically stored information particularly described herein and in Attachment B. For the reasons set forth below, there is probable cause to believe that such information contains evidence of the Subject Offenses.

7.     This affidavit does not purport to set forth all the facts gathered during the course of the investigation of this matter.  Rather, this affidavit includes only those facts which are necessary to establish probable cause to support the issuance of the requested warrants.

## PROBABLE CAUSE

9.     Law enforcement, including the FBI, has conducted, and is conducting a criminal investigation of FIGUEROA, DELROSARIO-CANELA, and others, regarding the Subject Offenses. The investigation is being conducted by the Waterbury Safe Streets Task Force. Based on the investigation to date, I believe that FIGUEROA, DELROSARIO-CANELA, Daniel DIAZ-RIVERA, Angel QUIROS, Oscar PENA-CRESPO, Ambar MORALES-RIVERA, Neysa VAZQUEZ-FERRER, Alfredo GONZALEZ, Michelle MORALES-RIOS, and others are involved in a cocaine, cocaine base (crack) and fentanyl distribution drug trafficking operation ("DTO") involving multiple individuals, which operates all hours of the day and night, every day of the week. DTO members use cellular telephones to coordinate the distribution of illegal narcotics in the Maple Avenue area of Waterbury, Connecticut.

10.     During the investigation, law enforcement has conducted numerous controlled purchases of narcotics confirming the DTO's distribution activities. Law enforcement has conducted approximately seventeen controlled purchases of suspected illegal narcotics from members of the DTO. The first controlled purchase from the DTO occurred on or about January 12, 2023. Law enforcement has conducted controlled purchases of narcotics from the holders of

the two phones that are the subject of the instant request, FIGUEROA and DELROSARIO-CANELA. The first controlled purchase from FIGUEROA was on June 12, 2023, and the first controlled purchase from DELROSARIO-CANELA was on July 7, 2023.

11.     Based on the investigation to date, I believe that the DTO has made efforts to preserve its narcotics activities through intimidation and violence to prevent other individuals from selling narcotics in their territory. For example, on December 25, 2022, a now-incarcerated DTO member and another unidentified DTO member confronted a rival drug dealer who was selling drugs in the area of Maple Avenue. This confrontation led to a shootout and vehicle pursuit in broad daylight in a busy part of Waterbury, Connecticut. Also, on March 29, 2023, the WPD responded to the area of Maple Avenue and Cherry Street in reference to a threat complaint. According to the complainant, they were approached by several men while working in the DTO's territory. One of the men, later identified as PENA-CRESPO, told the workers that they better not "fuck" with their money today. PENA-CRESPO motioned to another male who displayed a firearm. The police attempted to detain PENA-CRESPO, but he fled on foot. A foot pursuit ensued, and PENA-CRESPO discarded an item as he ran. PENA-CRESPO was caught and was arrested. Law enforcement recovered the discarded item and determined that it is consistent with crack cocaine packaged for distribution.

12.     On July 14, 2023, the Honorable U.S. District Judge Jeffrey Alker Meyer authorized the interception of wire and electronic communications occurring over a cellular telephone number 203-504-0958 (Target Telephone-1), used by FIGUEROA. On August 14, 2023, the Honorable U.S. District Judge Jeffrey Alker Meyer authorized the interception of wire and electronic communications over cellular telephone number 203-948-1087 (Target Telephone-2), used by FIGUEROA. On September 13, 2023, the Honorable U.S. District Judge

Jeffrey Alker Meyer authorized the interception of wire and electronic communications occurring over Target Telephone-2, used by FIGUEROA, cellular telephone number 475-313-4974 (Target Telephone-3), used by DIAZ-RIVERA, and cellular telephone number 203-217-4439 (Target Telephone-4), used by QUIROS.

13.     As illustrated below, communications intercepted over Target Telephone-2 confirmed that FIGUEROA is using the cellular telephone to coordinate the distribution of cocaine base as well as conspiring with other DTO members to sell narcotics.[1]

   a. *Sampling of Communications Intercepted over Target Telephone-2 Involving Subject Phone 1 (Target Telephone-2 used by FIGUEROA) and a Phone used by DELROSARIO-CANELA[2]*

14.     On August 16, 2023, at approximately 3:20 p.m., FIGUEROA, who was using Target Telephone-2, placed an outgoing call to MORALES-RIVERA, who was using telephone number 203-465-2237 (Session 347) and the following exchange took place:

> AM: Talk to me.
> TF:  Talk to me, I saw you called but I was in the shower.
> AM: I was talking with L and told him that the girl is finishing up soon she doesn't have much left. I was asking if I can leave her with Domi and he said just make sure I take the money.
> TF:  So, we are just waiting for her to finish.
> AM: Yes, and listen Coco, I was really embarrassed today this black guy showed up to complain about Domi and I had to give him 3 for $15.00 out of my stash.
> TF:  They are 3 for $15.00.
> AM: I mean no 3 for $10.00 you can ask.
> TF:  I wouldn't have given them to him.
> AM: Because he said that Domi has been there at 12:30.
> TF:  Having a side conversation ("That doesn't fit me").
> AM: Doing that shit.
> TF:  They are the dumb asses for that cause I haven't told them to be there they know better than that.

---

[1] The quoted transcripts in this affidavit are based on preliminary translations of Spanish communications as well an initial review of line sheets in draft form. The session numbers refer to the designation given to a particular wire or electronic communication.

[2] As discussed below, at the time **Subject Phone 2** was seized, law enforcement called the number DELROSARIO-CANELA has been intercepted using over Target Telephone-2 and did not observe **Subject Phone 2** ring. At this point, I believe **Subject Phone 2** may be a replacement phone for DELROSARIO-CANELA.

AM: I told him that this closes up at 12.
TF:  Um hum.
AM: I'm already here at the store, so ok that's all I called for.
TF:   So, from what's left that she has you made four.
AM: Yes, no more.
TF:   Ok.
AM: I took out my $100.00 and put the rest on the ticket.
TF:   All good.

15.     Based on pole camera and physical surveillance considered in conjunction with interceptions of communications over TARGET TELEPHONE-1 and Target Telephone-2, I believe that MORALES-RIVERA and DELROSARIO-CANELA are two of the main overseers of lower street-level distributors for the DTO in the area of Maple Avenue, Waterbury, Connecticut. As illustrated in the conversation set forth above, I believe that when MORALES-RIVERA stated, "I was talking with L and told him that the girl is finishing up soon she doesn't have much left," it was a reference to a conversation between MORALES-RIVERA and DIAZ-RIVERA ("L") regarding the quantity of cocaine base an unidentified female had left to sell in the area of Maple Avenue. Further, I believe that when MORALES-RIVERA stated, "I was asking if I can leave her with Domi and he said just make sure I take the money," this was a reference by MORALES-RIVERA that indicated the unidentified female would be overseen by DELROSARIO-CANELA ("Domi") and that DIAZ-RIVERA wanted MORALES-RIVERA to take the proceeds of the drug sale from the unidentified female. I believe that when MORALES-RIVERA stated, "I took out my $100.00 and put the rest on the ticket," it was a reference to MORALES-RIVERA taking out her cut of the profits of the illegal drug sales.

16.     On August 17, 2023, at approximately 9:50 p.m., FIGUEROA, who was using Target Telephone-2, placed an outgoing call to VAZQUEZ-FERRER, who was using telephone number 203-465-9223 (Session 527), and the following exchange took place:

NV: Hello.

TF: Listen, make sure that when you guys make the caps...the packages that will go to Domi, make sure that there is a [unintelligible] in each cap.
NV: What?
TF: Because he is fucking complaining about the caps all day long.
NV: He did not complain yesterday.
TF: He's been complaining all day, saying that the caps are empty. The caps are empty.
NV: They are not empty. I was the one who made them. They are fine.
TF: No, there are some small ones.
NV: Well, I fill them up to the top but, if it comes out to less, then Lupin better not fuck us. Because I try to do what he said that we have to do in order for them to come out. You get me?
TF: He is saying that he even got some empty caps.
NV: Liar!
TF: He asks me, "Where is my profit?"
NV: He should not be a liar because those are the ones that I made. I brought down to you the two packages that I made.
TF: I'm just telling you.

17.     Based on training, experience, and information learned during the investigation, I believe that the conversation set forth above pertained to narcotics distribution and conspiracy to do so. Specifically, I believe that when FIGUEROA stated, "Listen, make sure that when you guys make the caps...the packages that will go to Domi, make sure that there is a [unintelligible] in each cap," this was a reference to the quantity of cocaine base VAZQUEZ-FERRER was putting in each "cap." Further, I believe that when VAZQUEZ-FERRER stated, "Well, I fill them up to the top but, if it comes out to less, then Lupin better not fuck us. Because I try to do what he said that we have to do in order for them to come out," this was a reference to VAZQUEZ-FERRER's concern about disapproval by DIAZ-RIVERA ("Lupin") of a potential loss of profits if she had to put more cocaine base in each "cap."

18.     On August 17, 2023, at approximately 10:24 p.m., FIGUEROA, who was using Target Telephone-2, placed an outgoing call to VAZQUEZ-FERRER, who was using telephone number 203-465-9223 (Session 588) and the following exchange took place:

NV: Hello.

TF:  Honey, can you try to make one really quick?
NV: How many?
TF:  One, but it has to be quickly.
NV: Why?
TF:  Because people are coming, and he wants to leave one here.
NV: Come then because I... I forgot, and I touched it, and I have the drug test, and I don't know to to take to clean up.
TF:  But it's just this job. Make one, honey.
NV: Alright. Negra is cutting it and I'll make it quickly.
TF:  Alright.
NV: Alright.

19.     Based on training, experience, and information learned during the investigation, I believe that the conversation set forth above pertained to narcotics distribution and conspiracy to do so. Specifically, I believe that when FIGUEROA asked for "One," it was a reference to one "package" or "pack" of cocaine base capsules. Law enforcement has conducted controlled purchases of a "pack" or "package" from FIGUEROA that each consisted of 75 pink plastic containers ("caps") each containing a white rock-like substance (suspected cocaine base). Further, I believe that VAZQUEZ-FERRER expressed concern about handling narcotics due to an upcoming drug test. During the exchange, I believe that VAZQUEZ-FERRER also confirmed that a third-party, "Negra," was dividing the narcotics for street-level distribution ("cutting it"), and that once "Negra" had finished, VAZQUEZ-FERRER would package the narcotics as requested by FIGUEROA ("I'll make it quickly").

20.     On August 25, 2023, at approximately 2:21 p.m., FIGUEROA, who was using Target Telephone-2, placed an outgoing call to DELROSARIO-CANELA, who was using telephone number 475-337-7910 (Session 1072) and the following exchange took place:

JD: Are you going to come over here?
TF: Yes.
JD: Come on, come on, come on, come over here.
TF: Why do you need me there?
JD: We need drugs here.
TF: There aren't any drugs?

JD: Yes, there is a little bit left, coke.
TF: Ah, well, but so.
JD: [Unintelligible]
TF: Do you have any left? But, dude, I am on my way there now.
JD: There is a little bit left, but we are looking ugly now.

21.     Based on training, experience, and information learned during the investigation, I believe that the conversation set forth above pertained to narcotics distribution and conspiracy to do so. Specifically, I believe that DELROSARIO-CANELA contacted FIGUEROA to obtain narcotics to sell on Maple Avenue because he and DTO members were starting to run low on the quantity they had in their possession ("we need drugs here"). In turn, FIGUEROA agreed to provide the resupply of narcotics ("I'm on my way there now").

22.     On August 28, 2023, at approximately 8:36 p.m., Target Telephone-2 received an incoming SMS message from telephone number 203-528-8526 (Session 1583) that stated, "Can you give me 30?" Approximately five minutes later, FIGUEROA, who was using Target Telephone-2, placed an outgoing call to an unknown male (UM8526), who was using telephone number 203-528-8526 (Session 1584) and the following exchange took place:

TF: What's up dude?
UM8526: I'm stopping by for a 30. Someone wants a 30 here.
TF: I'm currently waiting for it. I ran out.

23.     Based on training, experience, and information learned during the investigation, I believe that the conversation set forth above pertained to narcotics distribution and conspiracy to do so. Specifically, I believe that UM8526 contacted FIGUEROA for a $30.00 quantity of narcotics via text message and then followed the initial request with a similar phone conversation.

24.     On August 29, 2023, at approximately 3:07 p.m., FIGUEROA, who was using

Target Telephone-2, received an incoming call from VAZQUEZ-FERRER, who was using

telephone number 203-465-9223 (Session 1795) and the following exchange took place:

TF:  Hello?
NV:  Hello?
TF:  Go ahead.
NV:  Did you bring up--did you bring up the money from yesterday and the day before?
TF:  Yes, why?
NV:  "L" asked for them.
TF:  Well, they are in the drawer in the little white bag.
NV:  [to background] That in the drawer in the little white bag. The first--not the ones in the pack 100s. [unintelligible] In a small white bag.
TF:  It is a grocery store bag.
NV:  [To an unidentified person in the background] A grocery store bag, baby, you know?
TF:  Alright. Thank you. Yeah.

25.     Based on training, experience, and information learned during the investigation, I

believe that the conversation set forth above pertained to VAZQUEZ-FERRER and FIGUEROA

discussing delivering profits of their drug sales from August 27, 2023, and August 28, 2023

("yesterday and the day before") to DIAZ-RIVERA ("L"), who had "asked for them."

26.     On August 29, 2023, at approximately 5:25 p.m., FIGUEROA and

DELROSARIO-CANELA, who were both using Target Telephone-2, received an incoming call

from VAZQUEZ-FERRER, who was using telephone number 203-465-9223 (Session 1808) and

the following exchange took place:

TF: Is is slow?
NV: It's very slow, slow. Gordo tallied up and I left him the other one there, and I left.
TF: Oh [unintelligible]. That Gordo [UI].
NV: [Unintelligible] and he took about half an hour to give me the money.
JD: [Unintelligible]
TF: He is like that.
NV: And the cops passed by, and I was like, "This dude!"
TF: [Unintelligible]
NV: I really don't know why Danny put him there. For real, I don't like him.
TF: He does not sell. To tell you the truth, he should have already sold them all.

JD: That dude does not sell. There are people who come to buy and he says, "No". My people tell him, and he [unintelligible].

27.     Based on training, experience, and information learned during the investigation, I believe that the conversation set forth above pertained to narcotics distribution and conspiracy to do so. Specifically, I believe that VAZQUEZ-FERRER advised FIGUEROA that there were not a lot of individuals purchasing cocaine base at the time ("It's very slow, slow"). Further, I believe that when VAZQUEZ-FERRER stated, "and he took about half an hour to give me the money," it was a reference to the time it took MARRERO ("Gordo") to give VAZQUEZ-FERRER the proceeds of narcotics transactions on Maple Avenue. Additionally, I believe that VAZQUEZ-FERRER commented on DIAZ-RIVERA's leadership within the DTO when she stated, "I really don't know why Danny put him there. For real, I don't like him."

28.     During the investigation, law enforcement has intercepted communications evidencing replacement or alternative phone numbers used by DTO members. For instance, on September 1, 2023, at approximately 2:14 p.m., FIGUEROA, who was using Target Telephone-2, received an incoming call from DELROSARIO-CANELA, who was using telephone number 475-337-7910 (Session 2034) and the following exchange took place:

JD: Oh. Boss?
TF: You will have to call him.
JD: Uh-huh. Boss, that was me that was calling you on the other number. Me. That is also my number.
TF: Oh, I did not see it.
JD: Yes, I was calling you. All set.
TF: Well, I will check it out and save it.

29.     Interceptions over Target Telephone-2 revealed that DELROSARIO-CANELA started using telephone number 203-509-5160 in addition to telephone number 475-337-7910. As discussed above, I know that drug traffickers and the couriers and transporters that work for sources of supply often compartmentalize operations by using different phones to communicate

11

with different re-distributors so that if one part of the distribution operation is compromised by law enforcement, other aspects of the operation remain  intact. The use of multiple cell phones at the same time is one way to achieve such compartmentalization.

30.     On September 5, 2023, at approximately 7:29 p.m., Target Telephone-2 received incoming SMS messages from telephone number 203-528-8526 (Session 2423 and Session 2424) that stated, "18 caps are 90" and "I won't deal with Goldo." Approximately one minute later, Target Telephone-2 received an incoming SMS message from telephone number 203-528-8526 (Session 2425) that stated, "Head down now". Target Telephone-2, used by FIGUEROA, immediately responded, "Ok bro." (Session 2426).

31.     Based on my training and experience, as well as information gathered in the investigation so far, I believe that the unidentified individual using telephone number 203-528-8526 (UI8526) contacted FIGUEROA to obtain 18 plastic containers ("caps") of cocaine base and UI8526 did not want to obtain the narcotics from MARRERO ("Gordo"). FIGUEROA in turn agreed to sell narcotics to UI8526 ("head down now").

32.     On September 14, 2023, at approximately 5:56 p.m., Target Telephone-2 received incoming SMS messages from telephone number 203-465-9223 (Session 3561) that stated, "Do you think that L would give me at least two days this weekend? I'll work them?"

33.     Based on my training and experience, as well as information gathered in the investigation so far, I believe that VAZQUEZ-FERER, using telephone number 203-465-9223 contacted FIGUEROA to determined if DIAZ-RIVERA ("L") would allow her to sell illegal narcotics on Maple Avenue for two upcoming days ("two days this weekend").

34.    On September 16, 2023, at approximately 4:57 p.m., FIGUEROA, who was using

Target Telephone-2, received an incoming call from DELROSARIO-CANELA, who was using

telephone number 203-509-5160 (Session 3736) and the following exchange took place:

> TF: Hello.
> JD: Are you coming?
> TF: Are you done?
> JD: Yes, are you coming? There are some left.
> TF: Give me a few, I'll swing by.
> JD: Alright, come, come so you can give me some.
> TF: Alright.

35.    Based on my training and experience, as well as information gathered in the

investigation so far, I believe that DELROSARIO-CANELA contacted FIGUEROA to obtain

more illegal narcotics ("come so you can give me some") for distribution on Maple Avenue.

36.    On September 17, 2023, at approximately 2:09 p.m., FIGUEROA, who was using

Target Telephone-2, received an incoming call from VAZQUEZ-FERRER, who was using

telephone number 203-465-9223 (Session 3855) and the following exchange took place:

> TF: Hello.
> NV: Uh, they are made. He is going to make you two packets so that you can pick them
> up while he finishes the rest.
> TF: Well, have him send me a message.
> NV: Alright, then.
> TF: Alright.

37.    Based on my training and experience, as well as information gathered in the

investigation so far, I believe that a "packet" is a reference to of 75 plastic containers ("caps")

each containing a white rock-like substance (suspected cocaine base). Further, I believe that

when VAZQUEZ-FERRER stated, "while he finishes the rest" it was a reference to an

unidentified individual packaging the containers of crack cocaine on behalf of the DTO.

38.    On September 17, 2023, at approximately 8:28 p.m., Target Telephone-2 received

incoming SMS messages from telephone number 203-465-9223 (Session 3918 and Session

3920) that stated, "Do you have more of the black gloves that you had?" and "In order to finish the packages, dear."

39.     Based on my training and experience, as well as information gathered in the investigation so far, I believe that VAZQUEZ-FERRER contacted FIGUEROA to obtain gloves she could wear while she packaged illegal narcotics ("In order to finish the packages").

40.     On September 18, 2023, at approximately 4:44 p.m., FIGUEROA, who was using Target Telephone-2, placed an outgoing call to DELROSARIO-CANELA, who was using telephone number 203-509-5160 (Session 4246) and the following exchange took place:

> TF: Get a ride the house and knock on the door, the girl will give it to you.
> JD: Alright, I'll head over there now then.

41.     Investigators conducted physical and pole camera surveillance in the area of Maple Avenue and Irion Street following the call detailed in paragraph 40 (Session 4246). At approximately 5:11 p.m., GONZALEZ entered the driver's seat and DELROSARIO-CANELA entered the passenger's seat of a white sedan parked in a parked lot across from 29 Maple Avenue. Surveillance units followed the white sedan to [a particular address] on Irion Street known to be a residence of FIGUEROA. Investigators observed DELROSARIO-CANELA enter the residence and exit approximately two minutes later. DELROSARIO-CANELA reentered the white sedan and returned to Maple Avenue.

42.     On September 18, 2023, at approximately 5:45 p.m., FIGUEROA, who was using Target Telephone-2, received an incoming call from DELROSARIO-CANELA, who was using telephone number 203-509-5160 (Session 4416) and the following exchange too place:

> JD: I picked up three, I picked up three. You heard?
> TF: And you have some left?
> JD: No, I picked up three, I picked up three.
> TF: And how many have you tallied yet?
> JD: Me, me [U/I] two.

43.     Based on my training and experience, as well as information gathered in the investigation so far, I believe that during the telephone conversation detailed above (Session 4246) FIGUEROA instructed DELROSARIO-CANELA to go to FIGUEROA's residence to obtain illegal narcotics. I believe that GONZALEZ drove DELROSARIO to FIGUEROA's residence to obtain the illegal narcotics detailed through the surveillance observations in paragraph 41. Further, I believe that during the telephone call detailed above (Session 4416) DELROSARIO-CANELA confirmed that he obtained the illegal narcotics from FIGUEROA's residence ("I picked up three, I picked up three. You heard").

44.     On September 22, 2023, at approximately 3:16 p.m., FIGUEROA, who was using Target Telephone-2, placed an outgoing call to MORALES-RIVERA, who was using telephone number 203-465-2237 (Session 4964) and the following exchange took place:

> TF: Who did you give it to?
> AM: Flaco, do I owe him?
> TF: I don't trust that guy.
> AM: Well, I, I showered and ate and everything and he didn't-
> TF: Yeah, but it's not the same thing that you give him, um, one package to work, than to give him two.
> AM: Yeah, um, well I'll take it [U/I]. You can look for it.
> TF: Does he have a lot of, of that?
> AM: Do you have a lot left? It's already tallied? [To unidentified person in background] Yes, it's already tallied.
> TF: Okay then. Um, take that.
> AM: Should I take the money?
> TF: Take that tally for me and leave [U/I].

45.     Based on my training and experience, as well as information gathered in the investigation so far, I believe that MORALES-RIVERA was contacted by FIGUEROA regarding the status of the distribution of illegal narcotics on Maple Avenue. Further, I believe that when MORALES-RIVERA asked, "Do you have a lot left" she was eliciting the status of the quantity of illegal narcotics an unidentified individual on Maple Avenue had on his or her possession. I

believe that when MORALES-RIVERA asked, "Should I take the money?" it was a reference to her collecting proceeds of illegal narcotics sales for FIGUEROA.

   b. *Arrests of FIGUEROA and DELROSARIO-CANELA on September 25, 2023, and Seizure of the Subject Phones*

   46.   On September 25, 2023, at approximately 4:23 p.m., FIGUEROA, who was using Target Telephone-2, placed an outgoing call to an unidentified female (UF-3619), who was using telephone number 203-560-3619 (Session 5655), and the following exchange took place:

> TF: [U/I] that he passed by and at that same time, I said "Domi!" Listen, do you have that already, Gorda?
> UF-3619: Yes, I have two more.
> TF: Alright, I'll head over there and did [U/I] wake up or not?
> UF-3619: He is up already.
> TF: Put in, with a shirt or something, Keiki.
> UF-3619: Mm hmm.
> TF: In a bag, put the gun that is in the drawer.
> UF-3619: Okay.
> TF: I am headed that way already.
> UF-3619: Alright.
> TF: Alright.

   47.   On September 25, 2023, at approximately 4:28 p.m., FIGUEROA, who was using Target Telephone-2, received an incoming call from VAZQUEZ-FERRER, who was using telephone number 203-465-9223 (Session 5657) and the following exchange took place:

> NV: Hello, um, Gorda will finish another one, to make four. I am headed home now to finish up everything today. So, we finish that.
> TF: Miguel just passed by.
> NV: Where, by Cherry?
> TF: He went up and then he turned, and then went into the one-way street. I did not have the gun. I have it outside. I yelled to [U/I].
> NV: What's that? [U/I]
> TF: Listen, when I saw him come up, I told Domi, "Give me the gun." So, Domi went and got it from the dumpster and brought it to me to the vehicle.
> NV: Mm hmmm.
> TF: And I was aiming at him, but he did not get out. He only passed by. [U/I]
> NV: Is he tough?
> TF: He did not get out at all.
> NV: Did he see you?

TF: He must have seen me because she knows my car, they've seen me.
NV: Mm hmmm.
TF: I had to get the other one.
NV: The cowboy?
TF: Yes, haha, cowgirl.
NV: So, [U/I] chance of him shooting at you, you shoot first, forget that your life is first.
TF: Even if I have to go today, it does not matter.
NV: Huh?
TF: Even if I have to go today.
NV: Hmm, maybe he is passing by just to bother you, but if he decides to stop, you get me?
TF: Of course, just like he did the first day. I think that the first day he stopped because he did not see my vehicle.
NV: Forget it.
TF: Because everyone knows which one is my vehicle. Everyone knows me and it's not like I am hiding.
NV: Mm hmmm.
TF: I did not hide when I shot [U/I]. I won't hide now.
NV: Exactly.
TF: That they got me. I'll let one go to Christian's father too.

48.    Based on my training and experience, as well as information gathered in the investigation so far, I believe that the calls detailed above (Session 5655 and Session 5657) detailed FIGUEROA obtaining illegal narcotics ("two more") and a firearm ("put the gun that is in the drawer") from his residence located at [a particular address] on Irion Street, Waterbury, Connecticut. Further, I believe that FIGUEROA described a dispute he was having with an unidentified individual ("Miguel") and indicated his willingness to shoot at the individual if confronted while on Maple Avenue.

49.    Based on the calls detailed above (Session 5655 and Session 5657), investigators conducted pole camera and physical surveillance of the area of Maple Avenue. Investigators observed FIGUEROA exit his gold Ford Explorer on Maple Avenue and walked up Maple Avenue. FIGUEROA walked to the area of 29 Maple Avenue where he met with DELROSARIO-CANELA. FIGUEROA appeared to hand DELROSARIO-CANELA something who then appeared to place items around several trash cans located outside 29 Maple Avenue.

From prior surveillance of the DTO, I know that DTO members will frequently store contraband, including narcotics, throughout the distribution area, hidden in bushes or other items in an effort to decrease risk of law enforcement exposure. Investigators observed DELROSARIO-CANELA engage in what appeared to be several hand-to-hand transactions with individuals in the area.

50.     On September 25, 2023, at approximately 6:18 p.m., investigators conducted a stop of several individuals in the area of Maple Avenue including FIGUEROA and DELROSARIO-CANELA. When officers approached, DELROSARIO-CANELA was holding a glass pipe with a burnt end, consistent with paraphernalia known to be used to smoke illegal narcotics. A search incident to arrest of DELROSARIO-CANELA revealed another glass pipe with a burnt end inside the inner pockets of DELROSARIO-CANELA's jacket. DELROSARIO-CANELA also had $94.00 in U.S. currency. Additionally, law enforcement seized **Subject Phone 2** from DELROSARIO-CANELA's person. A more thorough search of DELROSARIO-CANELA at the Waterbury Police Department revealed him to be in possession of eight purple plastic capsules each containing a white rock-like substance.

51.     When officers approached, FIGUEROA was partially seated in the gold Ford Explorer with the driver's door open. FIGUEROA was holding **Subject Phone 1**. An investigator searched the area of 29 Maple Avenue where DELROSARIO-CANELA was observed appearing to place items revealed a silver Ruger SP101 .357 Magnum handgun with a black handle which was wrapped in a black T-shirt. The handgun contained five rounds of .357 ammunition. In the same area, the investigator also discovered a 40 caliber Glock 27 with a 22 round capacity magazine which was inside a black and white plastic bag. The Glock 27 was loaded with a round in the chamber. The magazine contained 19 rounds of ammunition.

Additionally, an investigator discovered a plastic bag which contained 36 clear plastic capsules, each containing a white rock-like substance.

52.     FIGUEROA was placed under arrest. An inventory search of the gold Ford Explorer revealed 37 white glassine bags stamped "Vamplife" each containing a white powder-like substance. Investigators also located $2,504.00 in U.S. currency. Investigators discovered $319.00 in U.S. currency on FIGUEROA's person.

53.     A field test of a sample of the white powder-like substance within one of the white glassine bags stamped "Vamplife" tested positive for the presumptive presence of fentanyl. A field test of a sample of one of the purple plastic capsules which contained a white rock-like substance tested positive for the presumptive presence of cocaine. A field test of a sample of one of the clear plastic capsules which contained a white rock-like substance tested positive for the presumptive presence of cocaine.

54.     An investigator used a Waterbury Police Department telephone to place a call to telephone number 203-948-1087, known to be associated with Target Telephone-2, used by FIGUEROA throughout the investigation. At the time the call was placed, **Subject Phone 1** received the telephone call, and the investigator verified the phone number displayed on the **Subject Phone 1** to be the phone number associated with the Waterbury Police Department telephone.

55.     An investigator used a Waterbury Police Department telephone to place calls to telephone number 475-337-7910 and telephone number 203-509-5160, known to be used by DELROSARIO-CANELA throughout the investigation. At the time the calls were placed, **Subject Phone 2** did not appear to receive the telephone calls placed by the investigator. Investigators learned that DELROSARIO-CANELA used multiple cellular telephones

throughout the investigation. From the training and experience of the investigative team, it is known that narcotics traffickers compartmentalize the use of their cellular telephones. I know that this is done to thwart law enforcement's ability to identify said telephones and to conduct wiretap surveillance on them. During this investigation, investigators came to believe that DELROSARIO-CANELA and members of the DTO are compartmentalizing the use of their cellular telephones.

56.     Based on my training and experience and discussions with other investigators, it is known that persons who smuggle and transport illegal narcotics frequently use cell phones to maintain contact with co-conspirators during travel and use cell phones to contact persons where the drugs are destined. This frequently occurs due to the transient nature of these smuggling operations and because members of these conspiracies frequently travel and require coordination of their movements to pick up and drop off drugs at designated times and places.

57.     Based on my training and experience I know that narcotic traffickers commonly maintain addresses or telephone numbers in cellular telephones, which reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization. Traffickers also maintain photographs and videotapes of participants and associates in narcotic trafficking activity, and property acquired because of narcotics trafficking activities. Drug distributors also communicate with their criminal associates frequently via text message and various encrypted applications such as WhatsApp and they frequently make use of and maintain multiple cell phones to compartmentalize operations and upon which those text messages and encrypted communications often remain stored.

58.     Based upon the foregoing, there is probable cause to believe, and I do believe, that FIGUEROA and DELROSARIO-CANELA have committed violations of the Subject

Offenses and that there is probable cause to believe that electronically stored information described herein and, in Attachment B, is recorded on the **Subject Phones** and constitutes evidence of the Subject Offenses. Further, given that the first controlled buys with the DTO occurred in January 2023 and the holders of the Subject Phones perform roles with the DTO, including distributing narcotics as evidence by the controlled purchases from both FIGUEROA and DELROSARIO-CANELA and the events surrounding their arrests on September 25, 2023, I request that the search warrants authorize the recovery of information in existence on the phone as of January 1, 2023.

## ELECTRONIC DEVICE SEARCHES

59.     Based on my training and experience, and consultation with, and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

   a.   the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

   b.   call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

   c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

d.   records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.   information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.   saved searches, locations, and route history in the memory of said device/s; and

h.   internet browsing history, to include, internet searches in the memory of said devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

60.    Based on my knowledge, training, and experience, and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period on the device.  This information can sometimes be recovered with forensics tools.

61.    *Forensic evidence.*  This application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Phones** were used, the

purpose of their use, who used them, and when.  There is probable cause to believe that this

forensic electronic evidence might be on the **Subject Phones** because:

    a.  Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a

file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the

device.  This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may,

after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who

used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage

medium that are necessary to draw an accurate conclusion is a dynamic process.

Electronic evidence is not always data that can be merely reviewed by a review

team and passed along to investigators.  Whether data stored on a computer is

evidence may depend on other information stored on the computer and the

application of knowledge about how a computer behaves.  Therefore, contextual

information necessary to understand other evidence also falls within the scope of

the warrant.

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who

used it, and when, sometimes it is necessary to establish that a particular thing is

not present on a storage medium.

62.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Phones** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.  Based on the above stated factual details of the investigation, there is probable cause to believe, and I do believe, that the **Subject Phones** contains stored electronic information, including telephone numbers, digits, names, text messages, photographs, videos, identifying information such as telephone numbers and serial numbers, the originating telephone numbers, and other electronic information as outlined in Attachment B, that will assist law enforcement in this investigation and which is evidence of the violations of the above.

## CONCLUSION

63.     For the reasons above, I respectfully request that the Court issue the proposed search warrants.

64.     I further request that the Court authorize execution of the warrants at any time of day or night because the **Subject Phones** are already in possession of the FBI.

Respectfully submitted,

DANIEL
VEALE

Digitally signed by
DANIEL VEALE
Date: 2023.10.06
08:49:15 -04'00'

Daniel Veale
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me by telephone on October___, 2023.

Maria E.
Garcia

Digitally signed by Maria
E. Garcia
Date: 2023.10.06
12:58:59 -04'00'

HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

**<u>ATTACHMENT A</u>**

**Property To Be Searched**

A black Samsung cellular telephone in a black case, IMEI: 353122990222239, which was seized during the arrest of FIGUEROA on September 25, 2023, and which is presently in the custody of the FBI (**Subject Phone 1**).

A blue Motorola cellular telephone in a black case, which was seized during the arrest of DELROSARIO-CANELA on September 25, 2023, and which is presently in the custody of the FBI (**Subject Phone 2**).

This warrant authorizes the forensic examination of **Subject Phone 1** and **Subject Phone 2** (collectively referred to herein and in Attachment B as the "**Subject Phones**") for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

All records and information contained in the Subject Phones evidencing drug trafficking offenses and firearm offenses in violation of 21 U.S.C. § 841(a)(1) (possession with the intent to distribute and distribution of controlled substances); 21 U.S.C. § 846 (conspiracy to possess with the intent to distribute and distribution of controlled substances); 21 U.S.C. § 843(b) (use of a communication facility in furtherance of a controlled substance felony); and 18 U.S.C. § 924(c) (using and carrying a firearm during and in relation to, and possession of a firearm in furtherance of, a drug trafficking offense) (the "Subject Offenses"), to include the following, as they relate to the above-listed offenses:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of 21 U.S.C. §§ 841(a)(1) and 846 and 843 between January 1, 2023, and September 25, 2023;

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software between January 1, 2023, and September 25, 2023;

7. saved searches, locations, and route history in the memory of said telephone between January 1, 2023, and September 25, 2023;

8. internet browsing history, to include, internet searches in the memory of the telephone between January 1, 2023, and September 25, 2023;

9. images and videos in the memory of the telephone between January 1, 2023, and September 25, 2023; and,

10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs,

phonebooks, saved usernames and passwords, documents, and browsing history between January 1, 2023, and September 25, 2023.

As used above, the terms "records" and "information" include all the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that either or both Subject Phones contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.